IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| JEFFREY HEMMEN, individually; ROBERT CLARDY, individually; WENDE DOOHAN, individually; DIANNA MAXUM, individually; and GREG and SHERRY COCHRAN, individually and in their marital community thereof, | No. 83136-4-I |
| | DIVISION ONE |
| Respondents/Cross Appellants, | |
| v. | UNPUBLISHED OPINION |
| JIMMY and AMY CHO, individually or in their marital community thereof, | |
| Appellants/Cross Respondents. | |

BOWMAN, J. — Jimmy and Amy Cho own a parcel of land that includes a 30-foot-wide private road along their western boundary. After the Chos put up a gate across the road, several neighbors sued, arguing their prior use created a prescriptive easement to access the road. The trial court dismissed their claim on summary judgment. One plaintiff, Wende Doohan, proceeded to a bench trial on her claim that she benefits from an express easement to access the road. The trial court ruled for Doohan and determined that the Chos' gate unreasonably interfered with her easement rights. We affirm the trial court's dismissal of the neighbors' prescriptive easement claims at summary judgment and its ruling for Doohan on her express easement claim. But we reverse the trial court's determination that the Chos' gate unreasonably interferes with

This opinion bases the citations and pin cites on the Westlaw online version of the cited material.

Doohan's easement and remand for further proceedings consistent with this opinion.

## FACTS

In 1949, W.C. Mading conveyed a parcel of undeveloped land in the East Renton Highlands of King County to A.J. Olmsted. The property sat on the southwest bank of Lake Kathleen, and Olmstead could access the property only by West Lake Kathleen Drive SE, a private dirt and gravel road. The road was an arterial from SE 128th Street to the north, running about a mile south along Lake Kathleen and terminating at the northwest corner of the Olmstead property.

In 1955, Olmsted conveyed the land to Amy Lang. The "1955 Deed" includes these exceptions:

> EXECPTING the minerals and right to explore for and mine the same heretofore reserved by W.C. MADING and MAYBELLE E. MADING, his wife. . . . ALSO EXCEPTING the south 30 feet of the above described land for road. . . . ALSO EXCEPTING the west 30 feet of the above described land for road.[1]

At the time of the sale, King County owned the 30-foot-wide strip of land "for road" that ran along the southern edge of the property.

In 1959, Lang conveyed the land to Charles Tidd. The deed contained the same exceptions for a 30-foot-wide road along the western and southern edges of the property. In contemplating his purchase of the property, Tidd commissioned a land survey. The survey, pictured below, shows Tidd's plan to subdivide the land into several lots and provide access to the subdivided parcels by extending West Lake Kathleen Drive SE from the northwest corner of the

---

[1] Emphasis added.

2

property south along the 30-foot-wide strip of land on the western edge of the property, and connecting the road to the southwest corner of the parcel and the 30-foot-wide strip of land along the southern edge owned by King County.



At some point, someone, likely Tidd, developed a gravel road from the northwest corner of the property to extend West Lake Kathleen Drive SE from the north. The road continued down the 30-foot-wide strip of land along the western edge of the property and ended at the southwest corner of the parcel. Tidd subdivided and sold most of the land but kept the northern portion for himself, where he built a home.[2] Throughout the 1970s and 1980s, subsequent owners

---

[2] Tidd's property eventually becomes the Chos' property.

3

continued to subdivide the property. The gravel road crossing Tidd's parcel was the only means of ingress and egress to the subdivided parcels.

In 1983, several residents along West Lake Kathleen Drive SE executed a road maintenance agreement (RMA)[3] to share the cost of maintaining the gravel road. The agreement covered "a six block section of road known as West Lake Kathleen Drive S.E. from S.E. 140th to S.E. 144th,"[4] including the 30-foot-wide road crossing the western edge of Tidd's property. But each signatory agreed that their shared cost was "proportionate . . . to the total length or distance they must travel" to get to their residence.

In 1987, Mark and Barbara Creek bought Tidd's property. While their deed did not include an exception for the 30-foot-wide road along the western edge of the property, they knew about the exception from their title insurance.[5] That same year, the Creeks signed the RMA. Around 1991, the community organized and shared the cost of paving the entire length of West Lake Kathleen Drive SE.[6] The paved road remained a "narrow," single lane, dead-end road. Mark Creek testified that he never stopped anybody from using the road because he believed the language in his title insurance meant that his neighbors enjoyed an easement to cross his property.

---

[3] We note that there are many RMAs in the record, executed and signed by different neighbors over the years. We refer to them collectively as the RMA.

[4] SE 144th Street was a public road running west/east, at the time ending in a dead end at the southwest corner of Tidd's property.

[5] The Creeks' title insurance shows an easement for recording number 4631596 (the 1955 Deed) for a "road" affecting "the west 30 feet of the property herein described."

[6] There is no signed agreement to pave the gravel road in the record.

4

In 2004, King County extended SE 144th Street eastward and connected it to the southwest corner of the Creeks' property. Now, West Lake Kathleen Drive SE no longer ended in a dead end. As a result, residents along West Lake Kathleen Drive SE had a new source of ingress and egress. And vehicular traffic along West Lake Kathleen Drive SE and the western edge of the Creeks' property increased because vehicles used it "as a quick pass-through short cut" to and from SE 144th Street.

In 2019, the Creeks sold their property to the Chos. The Chos' deed contains the same exceptions as the 1955 Deed. Shortly after moving to the property, the Chos grew concerned with the amount of traffic speeding on the road across their property. In March 2020, the Chos erected a gate to stop traffic from using their road to access SE 144th Street.

In May 2020, Lake Kathleen resident Jeffrey Hemmen sued the Chos in King County Superior Court, alleging a prescriptive easement over the Chos' road and seeking injunctive and declaratory relief. Hemmen lives west of the Chos on SE 143rd Street and began using their road to access SE 144th Street after the county connected it to West Lake Kathleen Drive SE in 2004.

The same day Hemmen filed his original complaint, he filed an amended complaint, adding claims for ejectment to remove the Chos' gate and to quiet title because of "pre-existing easements and road maintenance agreements." The amended complaint also added as plaintiffs Robert Clardy, Dianna Maxum, Greg and Sherry Cochran, and Doohan (collectively Neighbors).

5

The Cochrans, Clardy, and Maxum live on West Lake Kathleen Drive SE several parcels north of the Chos. Greg Cochran, born in 1959, grew up in the area and has used the Chos' road to walk and bike since he "was young." Clardy and Maxum claim to have used the Chos' road generally for over 30 years. Doohan lives southeast of the Chos on one of the parcels subdivided from the original property described in the 1955 Deed. Since buying her parcel in 2006, Doohan has mostly accessed her home from SE 144th Street, but she sometimes used the Chos' road to enter and leave the neighborhood. Below is an illustrative map the Chos included in their opening brief:[7]



---

[7] The court did not admit this map at trial, and we use it for illustrative purposes only. The Chos also provided this map in their second motion for summary judgment. They added the bolded street names to the version in their opening brief. We also added the "GATE" label and the bolded outline around the Chos' and Doohan's properties to show the original parcel conveyed in the 1955 Deed. We note that the parties provided two different diagrams at trial to show where the gate is located. But its precise location along the southern portion of the disputed strip is not material to our analysis.

The Neighbors moved for summary judgment, arguing that their use of the Chos' road created prescriptive easement rights in their favor. The trial court denied the Neighbors' motion, citing several issues of material fact.

In January 2021, the Chos moved for summary judgment. They argued that the Neighbors' prescriptive easement claim failed as a matter of law because the Neighbors could not rebut a presumption of permissive use. The court granted the Chos' motion and dismissed the prescriptive easement claim. Only Doohan proceeded to a bench trial, claiming that the Chos' deed granted an express easement for her benefit and that the Chos' gate unreasonably interferes with her use of the road.

Before trial, the Chos moved to exclude testimony from the other Neighbors and Doohan's expert witness, Dwight Bickel, arguing that Doohan did not timely disclose him as a witness and that his testimony would amount to inadmissible legal conclusions. The Chos also moved to exclude any reference to the RMA as "irrelevant." The court denied the motions, allowing the Neighbors and Bickel to testify. After the close of testimony, the Chos moved for the trial judge to recuse herself, alleging bias in her rulings. The court also denied that motion.

After trial, the court entered extensive findings of fact and conclusions of law. The court determined that the "30-foot exception for road" language in the 1955 Deed conveying the original parcel of land from Olmsted to Lang created an express easement over the west 30 feet of the property that was never "extinguished, merged, or abandoned." And it determined that Doohan, as an

owner of one of the subdivided parcels of land, benefits from the easement. Finally, the court concluded that the Chos' gate unreasonably interfered with Doohan's easement rights and ordered the Chos to remove the gate. The court stayed the order pending appeal.

The Chos appeal and the Neighbors cross appeal.

ANALYSIS

Prescriptive Easement

The Neighbors argue the trial court erred by granting the Chos' summary judgment motion to dismiss their claims for prescriptive easement. They also cross appeal the trial court's order denying their motion for summary judgment. The Chos argue the trial court erred by not dismissing the Neighbors as parties after granting their summary judgment motion.

We review summary judgment orders de novo. Elcon Constr., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 164, 273 P.3d 965 (2012). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Id.; CR 56(c). We construe the facts and all reasonable inferences in a light most favorable to the nonmoving party. Elcon Constr., 174 Wn.2d at 164. Still, a nonmoving plaintiff must show facts that support the essential elements of each claim. Helmbreck v. McPhee, 15 Wn. App. 2d 41, 50, 476 P.3d 589 (2020), review denied, 196 Wn.2d 1047, 481 P.3d 1097 (2021). The facts must be specific and show a genuine issue for trial; conclusory allegations, speculative statements, or argumentative assertions do not satisfy the plaintiffs' burden. Boyd v. Sunflower Props., LLC,

197 Wn. App. 137, 142-43, 389 P.3d 626 (2016). If the plaintiff fails to meet its burden, summary judgment for the defendant is proper. Knight v. Dep't of Lab. & Indus., 181 Wn. App. 788, 795-96, 321 P.3d 1275 (2014).

The law does not favor prescriptive easements because they effectuate the forfeiture of a landowner's property rights. Tiller v. Lackey, 6 Wn. App. 2d 470, 483, 431 P.3d 524 (2018). To establish a prescriptive easement, a claimant must show use of the other person's land

> for a period of 10 years in a manner that was (1) "open" and "notorious," (2) "continuous" or "uninterrupted," (3) over "a uniform route," (4) "adverse" to the landowner, and (5) "with the knowledge of such owner at a time when he was able in law to assert and enforce his rights."

Id. at 484[8] (quoting Gamboa v. Clark, 183 Wn.2d 38, 43, 348 P.3d 1214 (2015)). Whether a claimant has established the elements of a prescriptive easement is a mixed question of fact and law. Petersen v. Port of Seattle, 94 Wn.2d 479, 485, 618 P.2d 67 (1980).

Here, the parties dispute whether the Neighbors' use of the disputed road was "adverse." "Adverse use" means use that was "not permissive." Tiller, 6 Wn. App. 2d at 484. Whether use is adverse or permissive is usually a question of fact. Nw. Cities Gas Co. v. W. Fuel Co., 13 Wn.2d 75, 84, 123 P.2d 771 (1942); Imrie v. Kelley, 160 Wn. App. 1, 8, 250 P.3d 1045 (2010). But when the essential facts are not in dispute, we can resolve it solely as a question of law. Imrie, 160 Wn. App. at 8. We measure adverse use by an objective standard

---

[8] Internal quotation marks omitted.

and look to the objectively observable acts of the claimant and the landowner. Tiller, 6 Wn. App. 2d at 484.

### 1. Presumption of Permissive Use

The Chos argue the trial court properly recognized that the Neighbors' use of their road is presumed permissive because there is a reasonable inference of neighborly sufferance or acquiescence. The Neighbors argue the evidence does not support applying a presumption of permissive use.

Generally, when someone enters the land of another, we start with the presumption that the person " 'does so with the true owner's permission and in subordination to the latter's title.' " Gamboa, 183 Wn.2d at 44 (quoting Nw. Cities, 13 Wn.2d at 84). This presumption of permissive use applies in (1) "cases involving unenclosed land," (2) "enclosed or developed land cases in which 'it is reasonable to infer that the use was permitted by neighborly sufferance or acquiescence,' " and (3) cases in which "the evidence demonstrates that the owner of the property created or maintained a road and his or her neighbor used the road in a noninterfering manner." Id. (quoting Roediger v. Cullen, 26 Wn.2d 690, 707, 175 P.2d 669 (1946)).

Here, the parties dispute whether it is reasonable to infer from the evidence that neighborly sufferance or acquiescence permitted the Neighbors' use of the road. "What constitutes a reasonable inference of neighborly sufferance or acquiescence is a fairly low bar." Gamboa, 183 Wn.2d at 51. In Gamboa, a gravel road separated parcels of land owned by the Gamboas and the Clarks. Id. at 40. For more than 10 years, the Gamboas used the Clarks'

gravel road to access their house and some of their farmland. Id. at 41. Our Supreme Court held that the evidence supported a reasonable inference of neighborly sufferance or acquiescence because both parties used the road without dispute for many years and each was aware of the other's use, but no one objected to it. Id. at 51.

Here, the Neighbors used the road crossing the Chos' land along with the Chos and their predecessors for several years without dispute. As in Gamboa, it is reasonable to infer that the Neighbors' use arose from neighborly sufferance, giving rise to a presumption of permissive use.

2. Evidence Rebutting the Presumption of Permissive Use

The Neighbors argue that even if a presumption of permissive use applies, they "submitted sufficient evidence at summary judgment to defeat the presumption." We disagree.

Generally, a claimant can rebut the presumption of permissive use by showing (1) that their use was adverse and hostile to the rights of the owner, or (2) that the owner indicated by some act an admission that the claimant has a right of easement. Gamboa, 183 Wn.2d at 44-45. But when use arises out of mutual neighborly acquiescence, courts deem the use " 'permissive in its inception,' " and it is harder for claimants to rebut. Id. at 45 (quoting Roediger, 26 Wn.2d at 713-14). Claimants seeking to overcome a presumption of permissive

use arising out of neighborly acquiescence must show that they "distinctly and positively assert[ed] a claim of right" to access the property. Id. at 45-46.[9]

Citing Crescent Harbor Water Co. v. Lyseng, 51 Wn. App. 337, 753 P.2d 555 (1988), the Neighbors argue that they used the road under a claim of right because they never asked for permission to use it, and the former owner, Mark Creek, testified that he believed the Neighbors had a right to use it. But the Neighbors misconstrue our holding in that case.

In Crescent Harbor, in 1969, the owners of the servient estate formed the nonprofit corporation Crescent Harbor to make use of a well and water system on their own property. 51 Wn. App. at 338. Crescent Harbor used the water system unrestricted for several years. Id. The original landowners held title until 1982, and Crescent Harbor continued to use, maintain, and improve the water system without the permission of subsequent landowners. Id. In 1987, Crescent Harbor asked the new owners to execute an easement for access to and use of the well located on the property, but they refused. Id. Crescent Harbor sued, alleging that their use created a prescriptive easement to access the well. Id. at 339. The trial court ruled for Crescent Harbor, and we affirmed. Id. at 339, 346. We concluded that "[w]hen the owner of a servient estate confers upon another the right to use that property as if it had been legally conveyed, the resultant use is made under a claim of right, rather than by permission." Id. at 342. And the undisputed evidence permitted only one reasonable inference—that the original

---

[9] When use is permissive in its inception, it cannot ripen into a prescriptive right unless there has been " 'a distinct and positive assertion by the dominant owner of a right hostile to the owner of the servient estate.' " Gamboa, 183 Wn.2d at 45 (quoting Nw. Cities, 13 Wn.2d at 84).

landowners "intended to grant Crescent Harbor a permanent right to access and use the well and water system." Id. at 342-43.

Unlike Crescent Harbor, the evidence here does not show that the Creeks intended to grant the Neighbors a permanent right to use their road. Mark[10] testified that when he bought his property from Tidd, he believed that his neighbors already had the right to access the road and that everyone had to share in the cost of maintaining it.[11] While that evidence may explain why the Creeks did not object to the Neighbors' use of their road, it does not show that the Creeks intended to grant them a permanent right to use it.

Next, the Neighbors rely on Washburn v. Esser, 9 Wn. App. 169, 511 P.2d 1387 (1973), to argue that the RMA conveyed a permanent right to its signatories to use the road crossing the Chos' property.[12] In Washburn, four neighbors agreed to share the cost to construct a road through their properties so they could each access a particular destination—a beach. Id. at 170. The trial court determined the agreement amounted to an easement because the evidence showed an intent among the parties to grant access through each other's

---

[10] We refer to Mark Creek by his first name for clarity and intend no disrespect by doing so.

[11] Mark stated in his declaration:
It was a known fact that everyone had to share in the maintenance of the road and everyone living on the road had access. This was why my wife Barbara and I joined the [RMA] in 1987. . . . I believed that I had the right to use the road and I had to contribute to the maintenance of it. It was a dirt road that had to be constantly re-graveled.

[12] Every plaintiff in this case is a party to the RMA, except Hemmen and the Cochrans. But the predecessor in interest to the Cochrans is Warren Scranton, and he signed the RMA in 1983. Doohan's declaration is illegible, but the record shows her predecessors in interest are Thomas and Eunice Kelly, who also signed the RMA in 1983.

property as a "matter of right." Id. at 171-72. Division Two of our court affirmed. Id. at 173.

But the RMA here is distinct from the agreement in Washburn. The parties to the RMA did not create a road to benefit mutual access to a particular destination. Rather, the RMA provides that its signatories shall "cooperate and share the costs of maintaining the road with a gravel surface." And it requires the signatories to pay a proportionate share of the total cost to maintain the road only "as relates to the total length or distance they must travel over the road to their respective residences." Because no signatory needs to travel over the Chos' road to reach their respective residences along West Lake Kathleen Drive SE, none of them contributed to the cost of maintaining that portion of the road. Nothing in the RMA shows an intent by its signatories to grant other signatories a permanent right to use their respective portions of West Lake Kathleen Drive SE.

Finally, the Neighbors argue that Mark's acknowledgement of an appurtenant neighbor's right to use his road in an unrelated 1988 boundary line settlement agreement shows that they also have a claim of right to its use. But in the settlement agreement, Creek acknowledged an express easement in his deed granting only one of his appurtenant neighbors access to "that certain easement affecting the West 30 feet of the CREEK property as per the easement and conditions contained therein recorded October 28, 1955 under Recording Number 4631596 for the road." And the Neighbors do not dispute that only Doohan owns property appurtenant to Creek.[13]

---

[13] We discuss Doohan's claim to access the road under the express easement in the 1955 Deed below in section 4, "Conclusions of Law."

14

We affirm the trial court's order granting the Chos' motion for summary judgment dismissal of the Neighbors' prescriptive easement claims.[14] And because Doohan is the only plaintiff alleging rights from an express easement, we agree with the Chos that the trial court's refusal to dismiss Hemmen, the Cochrans, Maxum, and Clardy from the lawsuit after dismissing their prescriptive easement claims on summary judgment is error. On remand, the trial court shall enter an order dismissing those plaintiffs as parties.

Express Easement Bench Trial

The Chos allege a handful of errors related to the trial court's determination that Doohan benefits from an express easement over their property. According to the Chos, the trial court erred by refusing to exclude Doohan's expert witness and by denying their motion to recuse at the close of trial. They also challenge several findings of fact and conclusions of law. We address each issue in turn.

1. Motion to Exclude Expert Witness

The Chos argue that the trial court abused its discretion by denying their motion in limine to exclude Doohan's expert witness because she did not timely disclose him and his opinions amounted to legal conclusions. We review a trial court's decision to admit or exclude expert witness testimony for abuse of discretion. Lakey v. Puget Sound Energy, Inc., 176 Wn.2d 909, 919, 296 P.3d 860 (2013). A trial court abuses its discretion "by issuing manifestly

---

[14] Because we conclude summary judgment for the Chos is appropriate, we do not address the Neighbors' cross appeal of the trial court's order denying their motion for summary judgment.

unreasonable rulings or rulings based on untenable grounds, such as a ruling contrary to law." Id.

### a. Late Disclosure

The Chos argue that the trial court should have excluded Doohan's expert witness because she did not timely disclose him or summarize his opinions. We disagree.

Under King County Local Civil Rule (KCLCR) 26(k)(1), a party must disclose primary witnesses with relevant factual or expert knowledge "no later than the date for disclosure designated in the Case Schedule." The disclosure must include a summary of the expert's "opinions and the basis therefore and a brief description of the expert's qualifications." KCLCR 26(k)(3)(C).

A trial court has broad discretion in the choice of sanctions for a violation of the discovery rules. Burnet v. Spokane Ambulance, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997). But the court should exclude a witness under only rare circumstances. See Teter v. Deck, 174 Wn.2d 207, 216-17, 274 P.3d 336 (2012) (court may impose only the least severe sanction that will be adequate to serve its purpose). Before excluding a late disclosed witness, the court must determine that a discovery violation was willful, that it substantially prejudiced the nonviolating party, and that no lesser sanction would cure the prejudice. Id. A violation of a discovery rule or order is willful if done without a "reasonable excuse." Snedigar v. Hoddersen, 114 Wn.2d 153, 169, 786 P.2d 781 (1990).

The Chos argue that Doohan did not timely disclose Bickel as an expert witness. But the record does not support their argument. The record shows that

on April 19, 2021, the trial court issued an "Amended Case Schedule," setting May 17, 2021 as the deadline to disclose witnesses. At a telephone conference on April 29, 2021, the court confirmed that the deadlines in the Amended Case Schedule are "to be followed by the parties." Doohan timely disclosed Bickel as an expert witness on May 17, 2021.

Even so, the Chos are correct that Doohan did not provide a summary of Bickel's opinions until June 14, 2021, almost a month after the May 17 deadline. But the Chos fail to show that Doohan's late disclosure prejudiced them. The Chos knew as of May 17 that Doohan would call Bickel as an expert witness, and they made no effort to depose him or otherwise compel his opinions before trial. All the same, the court offered to continue the trial so that the Chos could depose Bickel. The Chos declined. Still, to mitigate the late disclosure, the trial court delayed Bickel's testimony to give the Chos a chance to depose him. And it permitted the Chos to call their own expert in response to Bickel's testimony. Ultimately, the Chos deposed Bickel, engaged in a lengthy cross-examination at trial, and chose not to call their own expert. The court cured any potential prejudice from Bickel's late disclosed opinions.

### b. Legal Conclusions

The Chos also argue that the trial court should have excluded Bickel as an expert witness because his testimony amounted to inadmissible legal conclusions. We disagree.

Under ER 702,

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in

17

issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

But when an expert's testimony amounts to a legal conclusion, it does not assist the trier of fact because it risks substituting the expert's judgment for that of the fact finder's. Davis v. Baugh Indus. Contractors, Inc., 159 Wn.2d 413, 420, 150 P.3d 545 (2007).

Evidentiary error is grounds for reversal only if it results in prejudice. Nelson v. Duvall, 197 Wn. App. 441, 459, 387 P.3d 1158 (2017). An error is prejudicial if " 'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.' " City of Seattle v. Pearson, 192 Wn. App. 802, 817, 369 P.3d 194 (2016) (quoting State v. Smith, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).

Bickel is a licensed attorney who works as a "title advisor" and specializes in residential property matters, providing consultation services to lawyers and limited representation to individuals. Doohan offered Bickel's testimony to help the court understand the "local history of what parties do when developing property, what parties mean when they use different words" in title documents, and to "assist the Court in its findings of fact related to interpretation of the [title] documents."

At trial, Bickel identified and interpreted chains of deeds in the Lake Kathleen area before and after the 1955 Deed at issue. He reviewed survey and plat maps to explain the circumstances surrounding the development of the Lake Kathleen neighborhood. He testified about the use of the term "except" in deeds

around Lake Kathleen before 1955 and offered several alternative interpretations of the term. And he identified a series of documents that he said show a "common development scheme" in the area surrounding the property at issue at the time Olmsted conveyed it to Lang in 1955. This testimony helped the court understand the evidence and did not amount to legal conclusions.

But Bickel also testified that the language of the 1955 Deed is "ambiguous," that the evidence shows the parties intended to create an easement, and that Doohan benefits from the easement. Bickel also offered his opinion on the legal implications of the Chos' interpretation of the 1955 Deed. The Chos objected to the testimony many times. The court overruled the objections, stating:

> [T]his is this expert's opinion. The Court doesn't have to accept that opinion. He's giving reasons why he believes that this is the most reasonable interpretation, and based on his experience and the exhaustive research he's done in this case, the Court will allow the testimony to continue.

As much as some of Bickel's testimony may amount to legal conclusions, the Chos fail to show prejudice. The court repeatedly stated that it was aware Bickel's testimony may include legal conclusions but that it would set them aside and form its own conclusions. A trial judge "is presumed to know the rules of evidence and is presumed to have considered only the evidence properly before the court, and for proper purposes." In re Welfare of Harbert, 85 Wn.2d 719, 729, 538 P.2d 1212 (1975). The court did not err by refusing to exclude Bickel's testimony as legal conclusions.

2.  Motion to Recuse

The Chos argue the trial court erred when it denied their motion to recuse after the close of evidence.  According to the Chos, the judge had a duty to recuse under due process and the appearance of fairness doctrine because she "displayed considerable favoritism and bias to the Plaintiff's benefit" throughout the trial.  We review a trial judge's decision whether to recuse for abuse of discretion.  State v. Perala, 132 Wn. App. 98, 111, 130 P.3d 852 (2006); Salas v. Hi-Tech Erectors, 168 Wn.2d 664, 668, 230 P.3d 583 (2010).

a.  Due Process

Due process requires a fair trial in a fair tribunal.  In re Murchison, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955).  But most issues of judicial disqualification do not rise to a constitutional level.  Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 876, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009) (citing Fed. Trade Comm'n v. Cement Inst., 333 U.S. 683, 702, 68 S. Ct. 793, 92 L. Ed. 1010 (1948)).  Only rarely will due process mandate disqualification.  Id. at 889-90.  When examining whether due process mandates disqualification, a court conducts an objective inquiry, asking "not whether the judge is actually, subjectively biased, but whether the average judge in [their] position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.' "  Id. at 881.

Potential bias violates the "Due Process Clause" of the Fourteenth Amendment to the United States Constitution in four limited circumstances.  First, when a judge has a direct, personal, substantial pecuniary interest in a case.  Tumey v. Ohio, 273 U.S. 510, 523, 47 S. Ct. 437, 71 L. Ed. 749 (1927).  Second,

20

when a judge oversees a criminal contempt proceeding and "previously served as grand juror in the same case, or where the party charged with contempt has conducted 'an insulting attack upon the integrity of the judge carrying such potential for bias as to require disqualification.' " Williams v. Pennsylvania, 579 U.S. 1, 20-21, 136 S. Ct. 1899, 195 L. Ed. 2d 132 (2016) (Roberts, C.J., dissenting on other grounds) (quoting Mayberry v. Pennsylvania, 400 U.S. 455, 466-67, 91 S. Ct. 499, 27 L. Ed. 2d 532 (1971)). Third, when an individual with a stake in a case had a significant and disproportionate role in the judge's campaign process. Caperton, 556 U.S. at 884. And fourth, when a judge has had an earlier significant, personal involvement as a prosecutor in a critical decision in the defendant's case. Williams, 579 U.S. at 8. The Chos allege no bias sufficient to support recusal under the Due Process Clause.

> b. Appearance of Fairness

Under the appearance of fairness doctrine, judges should disqualify themselves "in a proceeding in which their impartiality might reasonably be questioned." Sherman v. State, 128 Wn.2d 164, 188, 905 P.2d 355 (1995), see also CJC Canon 2.11(A). We use an objective test to determine whether a judge should disqualify herself. In re Pers. Restraint of Swenson, 158 Wn. App. 812, 818, 244 P.3d 959 (2010). The critical analysis for the appearance of fairness doctrine is how the proceedings would appear to a reasonably prudent and disinterested person. Chi., Milwaukee, St. Paul, & Pac. R.R. v. Human Rights Comm'n, 87 Wn.2d 802, 810, 557 P.2d 307 (1976). Because we presume the trial court performs its functions regularly and properly without bias or prejudice,

a party asserting a violation of the appearance of fairness doctrine must produce sufficient evidence showing bias; mere speculation is not enough. Tatham v. Rogers, 170 Wn. App. 76, 96, 283 P.3d 583 (2012).

The Chos argue that the trial judge showed bias warranting recusal under the appearance of fairness doctrine because she refused to exclude Bickel as an expert witness despite his late disclosure, failed to follow the law of the case doctrine by allowing testimony relevant to only the prescriptive easement claim dismissed on summary judgment, inequitably ruled on objections, and generally treated the Chos unfairly during trial. But Washington law is clear that judicial rulings alone " 'almost never constitute a valid showing of bias.' " West v. Ass'n of Dist. & Mun. Court Judges, 190 Wn. App. 931, 943, 361 P.3d 210 (2015) (quoting In re Pers. Restraint of Davis, 152 Wn.2d 647, 692, 101 P.3d 1 (2004)). The Chos have not persuaded us that the court's rulings showed bias warranting recusal under the appearance of fairness doctrine.

### 3. Findings of Fact

The Chos assign error to several of the trial court's findings of fact. After a bench trial, we look to whether substantial evidence supports a trial court's findings of fact. Endicott v. Saul, 142 Wn. App. 899, 909, 176 P.3d 560 (2008). "Substantial evidence is the quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." Id.

The Chos assign error to nearly two dozen of the trial court's findings of fact.[15] But they support only one assignment with legal argument or analysis. "It is incumbent on counsel to present the court with argument as to why specific findings of the trial court are not supported by the evidence and to cite to the record to support that argument." In re Est. of Lint, 135 Wn.2d 518, 532, 957 P.2d 755 (1998) (citing RAP 10.3). So, we do not address challenges to those findings unsupported by argument.[16]

As to the only challenged finding supported by argument, finding of fact 13, the trial court found that "[t]he Cho warranty deed from the Creeks to the Chos disclosed the exception for a road referred to in the 1955 Deed." At trial, the court admitted the Chos' warranty deed from the Creeks as "Exhibit 75." The deed says it is "subject to all those easements, covenants and restrictions listed in Schedule A, attached hereto and incorporated herein." "Schedule A" identifies an "[e]asement, including terms and provisions contained therein: Recording Information: 4631596 For: Road." Recording number 4631596 is the 1955 Deed that contains the exception for a road. Substantial evidence supports finding of fact 13.

4. Conclusions of Law

The Chos argue that the trial court erred when it concluded (1) that the 1955 Deed created an express easement to Doohan's benefit, (2) that the

---

[15] The Chos challenge findings of fact 5, 6, 8, 9, 13 to 16, 18, 19, 24, and 31 as "not supported by substantial evidence." And they argue findings of fact 1 to 4, 7, 15, 16, 23, and 26 to 30 are "not findings at all."

[16] The Chos also challenge several findings as "irrelevant to the 1955 [D]eed." We address the sufficiency of the trial court's findings in the Conclusions of Law section below.

easement was not extinguished, merged, or abandoned, and (3) that the Chos' gate unreasonably interfered with the easement.

After determining whether substantial evidence supports a trial court's findings, we review whether those findings support its conclusions of law. Endicott, 142 Wn. App. at 909. In evaluating the sufficiency of the evidence, we view all reasonable inferences from the findings in the light most favorable to the prevailing party. Jensen v. Lake Jane Est., 165 Wn. App. 100, 104, 267 P.3d 435 (2011). While the trier of fact is free to believe or disbelieve any evidence presented at trial, on appeal, we do not hear or weigh evidence, find facts, or substitute our opinions for those of the trier of fact. Quinn v. Cherry Lane Auto Plaza, Inc., 153 Wn. App. 710, 717, 225 P.3d 266 (2009). We review a trial court's conclusions of law de novo. Casterline v. Roberts, 168 Wn. App. 376, 381, 284 P.3d 743 (2012).

### a. Express Easement

The Chos argue the findings do not support the trial court's conclusion that "based on a preponderance of the evidence, there is an express easement over the Cho property that was created by the 30-foot exception for road in the 1955 Deed." We disagree.

Easements are interests in land and must be conveyed by a deed complying with the statute of frauds. Maier v. Griske, 154 Wn. App. 6, 15, 223 P.3d 1265 (2010); RCW 64.04.010. No particular words are necessary to grant an easement, and any words that clearly show an intent to grant an easement

24

are sufficient, provided the language is definite and certain enough in its terms. Beebe v. Swerda, 58 Wn. App. 375, 379, 793 P.2d 442 (1990).

We construe deeds to give effect to the parties' intentions, with particular attention to the intent of the grantor. Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc., 168 Wn. App. 56, 64, 277 P.3d 18 (2012). "The rules of contract interpretation apply to interpretation of an easement and a deed." Pelly v. Panasyuk, 2 Wn. App. 2d 848, 864, 413 P.3d 619 (2018); see Hollis v. Garwall, Inc., 137 Wn.2d 683, 695-96, 974 P.2d 836 (1999).

Washington courts follow the objective manifestation theory of contracts. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005). "Under this approach, we attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." Id. We impute "an intention corresponding to the reasonable meaning of the words used" and "generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." Id. at 503-04.

To interpret the intent of the parties, we may also use the "context rule." Berg v. Hudesman, 115 Wn.2d 657, 667, 801 P.2d 222 (1990). Under that rule, the court may consider evidence about

> (1) the subject matter and objective of the contract, (2) the circumstances surrounding the making of the contract, (3) the subsequent conduct of the parties to the contract, (4) the reasonableness of the parties' respective interpretations, (5) statements made by the parties in preliminary negotiations, (6) usages of trade, and (7) the course of dealing between the parties.

Pelly, 2 Wn. App. 2d at 866 (citing Berg, 115 Wn.2d at 666-68).

Here, the 1955 Deed conveyed from Olmsted to Lang a parcel of land,

> EXECPTING the minerals and right to explore for and mine the same heretofore reserved by W.C. MADING and MAYBELLE E. MADING, his wife. . . . ALSO EXCEPTING the south 30 feet of the above described land for road. . . . ALSO EXCEPTING the west 30 feet of the above described land for road.

Bickel testified that based on his experience, grantors will often use the term "except" when intending to convey an entire parcel of property subject to an easement. And he said the term was likely used to create an easement here, as his research uncovered no document showing that Olmsted retained and subsequently conveyed the west 30 feet of the parcel after the sale to Lang. Bickel's research suggested that there was a plan for "a common development scheme" of the parcel. He testified that a 1938 survey of former W.C. Mading Road, a 1944 plat map, and a 1946 deed conveying property from the Madings to Walter and Nada Sweeny showed that West Lake Kathleen Drive SE extended "all the way from the north end of Lake Kathleen all the way down to the point of beginning of what is now the Cho property." He opined that the language in the 1955 Deed is consistent with an intent to create an easement across the west 30 feet of the parcel to access later subdivision and development on the property. The court found Bickel's testimony credible.

Viewing these facts in a light most favorable to Doohan, substantial evidence supports the trial court's conclusion that the intent of the parties to the 1955 Deed was to convey the parcel subject to an express easement over the west 30 feet of the property to be used as a road for future subdivision and development.

b. Merger

The Chos argue the trial court erred by concluding that "[t]here is no credible evidence that [the] 30-foot express easement for road was ever extinguished, merged, or abandoned." We disagree.

Under the merger doctrine " 'one cannot have an easement in one's own property.' " Schlager v. Bellport, 118 Wn. App. 536, 539, 76 P.3d 778 (2003) (quoting Radovich v. Nuzhat, 104 Wn. App. 800, 805, 16 P.3d 687 (2001)). As a general rule, an easement is extinguished when the burdened and benefited—or dominant and servient—estates come into common ownership. Radovich, 104 Wn. App. at 805; Coast Storage Co. v. Schwartz, 55 Wn.2d 848, 853, 351 P.2d 520 (1960). But Washington law does not favor merger. Mobley v. Harkins, 14 Wn.2d 276, 281-82, 128 P.2d 289 (1942). And we will not compel a merger when the parties do not intend for it, when it would be adverse to the interests of the common owner, or when it would prejudice the rights of third persons. WT Props., LLC v. Leganieds, LLC, 195 Wn. App. 344, 350, 382 P.3d 31 (2016); Mobley, 14 Wn.2d at 282.

The Chos argue that "the 1955 [Deed] could not have conveyed an easement" because "[i]f it had, the easement would have merged into Ms. Lang's entire parcel, eliminating the easement." But even if no dominant and servient estates are identifiable at the time of a conveyance, an appurtenant easement can be created to benefit a dominant tenement, which will become identifiable later. Beebe, 58 Wn. App. at 382-83 (citing Roggow v. Hagerty, 27 Wn. App. 908, 911, 621 P.2d 195 (1980); Kalinowski v. Jacobowski, 52 Wash. 359, 366,

100 P. 852 (1909)); see also Queen City Sav. & Loan Ass'n v. Mechem, 14 Wn. App. 470, 472, 475, 543 P.2d 355 (1975) (deed containing the language " 'EXCEPT a strip of land 60 feet in width along the westerly margin for road' " granted an easement to benefit the parcels later subdivided from the conveyed land). And the evidence at trial supported the court's conclusion that the parties to the 1955 Deed intended to convey an easement to benefit later subdivision and development of the land. The court did not err by concluding there was no evidence that the easement created in the 1955 Deed was ever merged, extinguished, or abandoned.[17]

### c. Unreasonable Interference

The Chos argue that substantial evidence does not support the trial court's conclusion that they "do not have a right to put up a gate which unreasonably restricts access over the above-referenced easement." We agree.

The owner of a burdened estate may use their property in any reasonable manner, so long as it does not unreasonably interfere with an easement holder's use. Littlefair v. Schulze, 169 Wn. App. 659, 665, 278 P.3d 218 (2012). When the owner of a servient estate experiences a greater burden than that originally contemplated by the easement, the owner has the right to restrict use of the property through means such as a gate, so long as the gate does not unreasonably interfere with the dominant owner's use. Rupert v. Gunter, 31 Wn.

---

[17] The Chos also argue that "Plaintiffs and the Court fail to make the necessary finding of strength of title" to support an ejectment or quiet title action. But the Chos make no meaningful legal argument or analysis to support their claim, so we do not consider it. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

App. 27, 31, 640 P.2d 36 (1982). To determine whether a restriction such as a gate unreasonably interferes with an easement holder's use, we consider "(1) the increased burden on the servient estate, (2) whether the restrictions on the gate are reasonably necessary for protection, and (3) the degree to which the gate interferes with the dominant owner's use." Nw. Props. Brokers Network, Inc. v. Early Dawn Ests. Homeowner's Ass'n, 173 Wn. App. 778, 793, 295 P.3d 314 (2013).

The trial court made no findings in support of its conclusion that the Chos' gate unreasonably interfered with Doohan's enjoyment of the easement. And the trial record shows that substantial evidence would not support such a conclusion.

The Chos testified that a gate was necessary to curb the influx of traffic on their road. Several witnesses testified that cars tend to speed through the area. The Chos posted signs to curb the problem. When that failed, the Chos erected a metal gate, which extends across the southern end of West Lake Kathleen Drive SE. Jimmy Cho testified that some neighbors were "highly in favor" of the gate. The Chos also built a small "pedestrian" path around the gate for foot and bicycle traffic. Local residents can open the gate by a remote provided by the Chos[18] or by an application downloaded to a cell phone, and the Chos installed a "Knox Box" that "allows for emergency service."

Doohan testified that she uses her easement over the road to take out the garbage once a week, visit her family, access her two other properties on the

---

[18] The Chos offered all the neighbors remotes and gave them to those that wanted them, over a half dozen, so the local residents could continue travelling over the road.

lake, and drive to Maple Valley to visit her horse six times a week. The Chos offered Doohan a remote so she could continue to use the road for these purposes, but she declined. Instead, she chooses to use a different road to exit the neighborhood.

The evidence shows that the gate imposes an insignificant burden on Doohan's limited use of the easement, is reasonably necessary to limit use greater than that originally contemplated by the easement, and discourages cars from speeding down the road. Substantial evidence does not support the trial court's conclusion that the gate unreasonably interferes with Doohan's easement rights.

Attorney Fees

On cross appeal, the Neighbors ask for an award of attorney fees under RAP 14.2 and RCW 7.28.083 related to their prescriptive easement claim. We may award attorney fees on appeal when authorized by a contract, a statute, or a recognized ground of equity. Labriola v. Pollard Grp., Inc., 152 Wn.2d 828, 839, 100 P.3d 791 (2004). RCW 7.28.083(3) allows attorney fees to "[t]he prevailing party in an action asserting title to real property by adverse possession" when "the court determines such an award is equitable and just." But that statute does not authorize attorney fees for a prescriptive easement claim because such a claim " 'does not quiet title to land' " and " 'does not actually assert title to property.' " Sw. Suburban Sewer Dist. v. Fish, 17 Wn. App. 2d 833, 839, 488 P.3d 839 (2021) (quoting McColl v. Anderson, 6 Wn. App. 2d 88, 92-93, 429 P.3d

1113 (2018)).  In any event, the Neighbors did not prevail in their cross appeal. We decline to award the Neighbors attorney fees.

We affirm the trial court's order dismissing the Neighbors' prescriptive easement claim at summary judgment.  We also affirm the trial court's determination that the 1955 Deed conveyed an express easement to the benefit of Doohan.  But we reverse the trial court's conclusion that the Chos' gate unreasonably interferes with Doohan's enjoyment of the easement.  We remand for further proceedings consistent with this opinion.

_____
Bowman, J.

WE CONCUR:

_____         _____
Birk, J.                                                      Andrus, C.J.